

**SEALED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED
2012 SEP 11  PM 3: 24

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. Maria Feria, Relator, | § §  Civil Action No. SA12CA0843 XR |
| STATE OF CALIFORNIA ex rel. Maria Feria, Relator, | § § **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| STATE OF DELAWARE ex rel. Maria Feria, Relator, | § § |
| DISTRICT OF COLUMBIA ex rel. Maria Feria, Relator | § § **DO NOT ENTER INTO PACER DO NOT PLACE IN PRESS BOX** |
| STATE OF FLORIDA ex rel. Maria Feria, Relator, | § § **JURY TRIAL DEMAND** |
| STATE OF HAWAII, ex rel Maria Feria, Relator, | § § **COMPLAINT FOR: VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729, _ET SEQ._), AND STATE FALSE CLAIMS ACTS** |
| STATE OF ILLINOIS ex rel. Maria Feria, Relator, | § § § |
| STATE OF INDIANA ex rel. Maria Feria, Relator, | § § |
| STATE OF IOWA ex rel. Maria Feria, Relator, | § § |
| STATE OF MASSACHUSETTS ex rel. Maria Feria, Relator, | § § |
| STATE OF MINNESOTA ex rel. Maria Feria, Relator, | § § |
| STATE OF MONTANA ex rel. Maria Feria, Relator, | § § |
| STATE OF NEVADA ex rel. Maria Feria, Relator, | § § |
| STATE OF NEW JERSEY ex rel. Maria Feria, Relator, | § § |
| STATE OF NEW MEXICO ex rel. Maria Feria, Relator | § § |
| STATE OF NEW YORK ex rel. Maria Feria, Relator, | § § |

| | |
|---|---|
| STATE OF NORTH CAROLINA ex rel. Maria Feria, Relator, | § § |
| STATE OF OKLAHOMA ex rel. Maria Feria, Relator, | § § § |
| STATE OF RHODE ISLAND ex rel. Maria Feria, Relator, | § § § |
| STATE OF TENNESSEE ex rel. Maria Feria, Relator | § § § |
| STATE OF VIRGINIA ex rel. Maria Feria, Relator, | § § § § |
| vs. | § § § § |
| DEVRY, INC., DEVRY UNIVERSITY, ROSS UNIVERSITY SCHOOL OF MEDICINE, ROSS UNIVERSITY SCHOOL OF VETERINARY MEDICINE, CHAMBERLAIN COLLEGE OF NURSING, CARRINGTON COLLEGE, CARRINGTON COLLEGE OF CALIFORNIA, AMERICAN UNIVERSITY OF THE CARIBBEAN, | § § § § § § § § § § § § § |
| Defendants. | § § § |

## FALSE CLAIMS ACT COMPLAINT

### PRELIMINARY STATEMENT

1.     This is an action brought by Maria Feria ("Relator") to recover damages and civil

penalties on behalf of the United States of America and the various states listed in the caption for

false and/or fraudulent claims made, used, and caused to be made, used, or presented, by DeVry,

Inc., DeVry University, Ross University School of Medicine, Ross University School of

Veterinary Medicine, Chamberlain College of Nursing, Carrington College, Carrington College

of California, and American University of the Caribbean, ("Defendants") in violation of the

federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and the various states' false claims

acts.

## INTRODUCTION

2.      This action comes before the Court due to the submission of false statements and

claims that Defendants knowingly presented to, or caused to be presented to, the United States,

United States Department of Education, and the various states, in violation of the FCA and the

states' false claims acts.

3.      Defendants, for-profit institutions of higher education, seek to maximize

corporate profits by making fraudulent claims for payment through the federal and state

Governments' postsecondary financial aid programs.  In direct violation of the Higher Education

Act of 1965 ("HEA"), various state statutes, and federal and state contracts (collectively,

"regulations"), Defendants have and continue to utilize their admissions and financial aid

personnel like salespeople, conditioning their compensation and continued employment on their

ability to meet student enrollment expectations.  Defendants further violate these regulations by

causing their admissions and financial aid personnel to make misrepresentations to potential

students about statistics regarding employability after graduation, DeVry's accreditation, the cost

of enrollment, and the transferability of credits.  While these strategies are typically effective for

maximizing revenue, they are in conflict with the rules and regulations that must be followed in

order for an institution to be eligible for federal aid under Title IV of the HEA and other state

financial aid programs.

4.      Title IV programs, which are administered by the United States Department of

Education, provide eligible students seeking postsecondary education with various forms of

financial assistance, including, for example, Pell Grants, Direct Loans and Federal Work Study.

Defendants have made numerous false claims and statements in order to obtain and maintain eligibility under these programs to receive these funds from the Government.

5.      To obtain eligibility for Title IV funding, postsecondary schools, like Defendants, must, among other things, enter into a Program Participation Agreement ("PPA") with the Department of Education.  In each PPA, schools agree that they will comply with all program statutes and implementing regulations for institutional eligibility, including the regulations set forth in 34 C.F.R. § 668.  Section 668.14(b) states that "[b]y entering into a [PPA], an institution agrees that . . . [i]t will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds." 34 C.F.R. § 668.14(b)(22).  This provision is commonly referred to as the incentive based compensation ban.  Additionally, § 668.71 *et seq.* prohibits schools participating in Title IV programs from making misrepresentations, either directly or indirectly, to a student, prospective student, any member of the public, an accrediting agency, a State agency or the Department of Education, about their educational programs, financial charges or the employability of their graduates.

6.      Defendants have routinely violated these provisions in order to increase their enrollments and therefore fraudulently induce payment of Title IV funding from the Government.

7.      The incentive based compensation ban was codified in response to concerns of abusive recruiting practices by for-profit schools, like Defendants, and the increasing number of student loans in default that fell onto U.S. taxpayers.

8.      Effective July1, 2003, the Department of Education issued clarifying regulations that established several exceptions to the incentive based compensation ban, commonly referred

to as the "12 safe harbors." For example, schools were permitted to adjust a recruitment employee's salary no more than twice a year if the adjustment was not solely based on meeting enrollment or financial aid quotas.

9.      As of July 1, 2011, the Department of Education repealed these safe harbor exceptions to the incentive based compensation ban, which meant that participating schools could not condition any portion of an employee's compensation, directly or indirectly, on their success on meeting enrollment numbers.

10.     Defendants knowingly violated the incentive based compensation ban both before and after the July 1, 2011 regulation change in direct violation of the PPAs they signed to participate in Title IV funding.

11.     Prior to July 1, 2011, Defendants' compensation scheme for its admissions and financial aid personnel systematically violated the incentive based compensation ban and did not qualify for one of the safe harbor exceptions. Specifically, admissions and financial aid personnel were compensated using a variable incentive plan. Under this plan, employees received a base salary that was supplemented by a variable component that was based solely on the employee's success in meeting enrollment quotas. Employees were further incentivized with yearly trips. Additionally, failure to meet quotas resulted in pay reductions, demotions and termination.

12.     After the July 1, 2011 regulation change, Defendants implemented "new" compensation policies, but in reality nothing had changed. The new policies and performance metrics employed by Defendants are merely a cloak for the same illegal recruiting practices and compensation schemes that were in place before. Under the new system, employees are evaluated 40% based on DeVry's TEACH values and 60% on meeting TKO (Time, Knowledge, Observations) quotas. While this system may appear compliant on paper, its implementation

has, and continues to be, in violation of the HEA.  The TKO quotas, which track employee

marketing events, knowledge of DeVry products, and observations by management, are not

actually used to evaluate employee performance.  Instead, upper-management continues to track

enrollment numbers for each employee, and then artificially lowers (or raises) an employees'

TEACH evaluations based on their success in meeting enrollment quotas, regardless of how the

employee performs on their TKOs.  When employees satisfy their enrollment quotas their salary

is increased through period salary adjustments.  If an employee fails to meet satisfactory

enrollment numbers, he or she is subject to adverse employment actions, including a formal

"write-up," a pay decrease, or termination.  All managers and recruiting personnel know that the

new compensation system is just a sham or cover-up for the same illegal compensation schemes

used in the past.

       13.     By violating the incentive based compensation ban in direct contradiction of the

promises made in PPAs with the Department of Education, Defendants have knowingly

submitted, or caused to be submitted, numerous false claims for payments to the United States

Government.

       14.     Furthermore, since at least September 2008, DeVry has made misrepresentations

to students about statistics regarding employability after graduation, DeVry's accreditation, the

cost of enrollment, and the transferability of credits.  By making misrepresentations to potential

students, Defendant has violated the federal and state program participation agreements that it

entered into in order to receive government funding.

## JURISDICTION AND VENUE

       15.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this

Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e),

there has been no relevant public disclosure of the "allegations or transactions" in this Complaint.

16.     This Court has supplemental jurisdiction over related state law claims as they are predicated upon the same facts as the federal claims and merely assert separate damages suffered by the various states.

17.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside or transact, or have transacted business nationally and specifically within the Western District of Texas.

18.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§1391(b) and (c) because Defendants have transacted business in the Western District of Texas.

19.     The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendants to conceal from the United States and the states wrongdoing in connection with the allegations made herein.

## PARTIES

**Plaintiff**

20.     Relator Maria Feria was previously employed as a Regional Manager for Keller Center for Corporate Learning ("KCCL"), which is the marketing division for DeVry University and Keller School of Management ("Keller"). Keller is a graduate program offered at DeVry University. Ms. Feria began working for DeVry University in September 2008 as a Manager of Local Accounts at the Pomana, CA office. She was promoted to a Regional Manager position in February of 2010. Ms. Feria was employed as a Regional Manager until August 31, 2012, when she left the company. Ms. Feria holds a bachelor's degree in Business Administration and International Business and a master's degree in Organizational Management.

21.     As a Manager of Local Accounts ("MLA"), Ms. Feria was responsible for holding

marketing events to groups of potential students. A common type of marketing event was an event hosted by a particular company for its employees. At these meetings Ms. Feria was required to give a presentation to promote DeVry and generate "leads." As part of her job responsibilities she would talk to individuals after these meetings about why they should attend DeVry. She would then pass contact information to admissions advisors who would then follow up with these leads. At times, she would also talk to potential students over the phone in order to convince them to attend DeVry. Some of the marketing event meetings were held at corporations for their employees. DeVry had agreements with large corporations, such as Best Buy, where they would receive a discount on tuition for classes taken by their employees in exchange for allowing DeVry to make presentations and hold "lunch and learns" in order to convince employees to attend DeVry.[1]

22.     As a Regional Manager, Ms. Feria was responsible for a team of up to approximately one dozen MLAs. Her territory previously included the entire state of California, but she also had frequent contact with the regional manager in Texas and with other regional managers across the country. From July 22, 2011 to September 5, 2011 she went on administrative leave. Upon her return, they divided the state of California into two territories— the Northern and Southern Region. Her responsibilities as a Regional Manager included, but were not limited to, ensuring her team's success in meeting TKO quotas, meeting with individual team members, meeting with the Regional Director and Vice President to discuss enrollment numbers, and observing team members in recruitment activities.

---

[1] It varied from company to company whether all tuition of employees was paid or whether the employees also had to take out federal or state student loans, or pay the rest of the tuition themselves.

23.    If there have been any public disclosures of the particular allegations and transactions set forth in this Complaint, Relator is nevertheless an original source of the information and allegations in the instant complaint because she discovered the violations enumerated here through her personal observation while employed at DeVry Inc., and she has voluntarily provided the information to the United States Attorney and various states before the filing of this Complaint.

**Defendants**

24.    Defendant DeVry Inc. is a publicly-traded, for-profit organization that provides educational services across the United States and other foreign countries.  Since its inception in 1987, DeVry Inc. has grown to become one of the largest providers of private educational services in the United States.  DeVry Inc. is incorporated in Delaware and maintains a principal place of business at 3005 Highland Parkway, Downers Grove, Illinois, 60515.

25.    DeVry Inc., through its subsidiary educational institutions, offers a wide range of programs, including postsecondary degrees and certifications.  DeVry Inc.'s subsidiary educational institutions include: DeVry University, Ross University School of Medicine, Ross University School of Veterinary Medicine, Chamberlain College of Nursing, Carrington College, Carrington College of California, American University of the Caribbean, DeVry Brasil, Advanced Academics, and Becker Professional Education.

26.    Students attending DeVry University, Ross University School of Medicine, Ross University School of Veterinary Medicine, Chamberlain College of Nursing, Carrington College, Carrington College of California, and American University of the Caribbean are eligible to receive federal financial aid under Title IV of the HEA.

27.    DeVry University has locations in 26 states, totaling approximately 94 campuses. It offers undergraduate and graduate level degrees and certificates in business, engineering, arts

and sciences, technology and health sciences.  DeVry University also offers much of its
curriculum nationwide to students online.  During the Fall of 2011, the total amount of
undergraduate students enrolled at DeVry University exceeded 73,000.  DeVry 2011 10k Report,
p. 7.  The total amount of graduate level students during that same timeframe was over 23,000.
*Id.* at 8.  As of July 2012, according to DeVry's Table of Tuition, Fees, and Expenses, the
undergraduate tuition at DeVry University is currently $609 per credit hour for students enrolled
in 1-6 credit hours, and $365 for students enrolled in excess of 6 credit hours.  To illustrate, a
degree in Communications, requiring 122 credits, costs approximately $68,000, not including
books and other expenses.  *Id.*   In 2011, Title IV funding accounted for 81% of DeVry
University's undergraduate and graduate tuition revenue.  *See* DeVry May 2012 Quarterly
Report, p. 37.

      28.     Ross University School of Medicine ("Ross M.D.") is located in the Caribbean
country of Dominica with an additional location in Freeport, Grand Bahama.  DeVry 2011 10k
Report.  Ross M.D. students complete a four-semester "Foundations of Medicine" curriculum at
the Dominica campus, followed by a one-semester "Advanced Introduction to Clinical
Medicine" at the Dominica campus, the Ross clinical location in Miami, Florida, or at an
affiliated hospital in Saginaw, Michigan.  *Id.* at 9.  After passing Step 1 of the U.S. Medical
Licensing Examination, Ross M.D. students then complete the remainder of the ten-semester
program in clinical rotations located at one of 70 affiliated teaching hospitals in the United
States.  *Id.*  The enrollment at Ross M.D. is approximately 3,365.  *See* Princeton Review Profile
of Ross University School of Medicine.  As of September 2011, tuition and fees at Ross M.D.
begin at $16,575 per semester for the "Foundations of Medicine" curriculum, and increases to
$18,200 per semester for the remainder of the ten-semester program.  DeVry 2011 10k Report.

In 2011, Title IV funding accounted for 81% of Ross M.D.'s tuition revenue.  DeVry May 2012 Quarterly Report, p. 37.

29.     Ross University School of Veterinary Medicine ("Ross D.V.M.") is located in St. Kitts.  Ross D.V.M. students initially complete a seven-semester curriculum at the St. Kitts facility, followed by a 48-week clinical clerkship at one of 22 affiliated U.S. Colleges of Veterinary Medicine, under Ross D.V.M's direction.  The enrollment at Ross D.V.M. is approximately 900 students.  *See* Ken Niedziela, *Ross Students are Quick Learners*, Veterinary Practice News.  As of September 2011, tuition and fees at Ross D.V.M. begin at $15,800 per semester for the initial seven semester curriculum, and increases to $19,850 per semester for the remainder of the program.  DeVry 2011 10k Report.  In 2011, Title IV funding accounted for 89% of Ross D.V.M.'s tuition revenue.  DeVry May 2012 Quarterly Report, p. 37.

30.     Chamberlain College of Nursing was acquired by DeVry Inc. in March 2005. DeVry 2011 10k Report, p. 10.  Chamberlain offers three levels of nursing degrees: an Associate's (ADN), Bachelor's (BSN), and a Master's.  *Id.*  Currently, there are 11 Chamberlain campuses in the United States, all of which are co-located with a DeVry University. Chamberlain's BSN program is designed to be completed in three years of full-time study.  *Id.* at 11.  The ADN program is a six-semester, year round program that is offered onsite or online only from the Columbus, Ohio location.  *Id.*  Chamberlain's Master's program is offered online and takes approximately two years of part-time study to complete.  *Id.*  In the July 2011 semester, there were approximately 10,000 students enrolled at Chamberlain.  *Id.* at 10.  As of July 2012, tuition for Chamberlain's associate's or bachelor's programs is $650 per credit hour for students enrolled in 1-6 hours per session, and $100 per credit hour for students enrolled in 7 or more hours per session.  *See* 2012-2013 Tuition & Expenses.  The cost for Chamberlain's Master's program is $650 per credit hour, regardless of course load.  *Id.*  In 2011, Title IV funding

accounted for 71% of Chamberlain's tuition revenue.  DeVry May 2012 Quarterly Report, p. 37.

31.     Carrington College and Carrington College of California were acquired by DeVry Inc. in September 2008.  DeVry 2011 10k Report, p. 11.  The two colleges operate 19 campuses in the western United States, and currently serve approximately 8,300 students.  *Id.*  Carrington specializes in career-specific certificate and associate degree programs, such as medical billing, registered nursing, dental hygiene, pharmacy technology, and graphics design.  *Id.* at 12.  The tuition at Carrington varies from approximately $12,000 for certificate programs and up to $60,000 for some advanced programs.  *Id.* at 24.  In 2011, Title IV funding accounted for 82% of Carrington College's tuition revenue, and 85% of Carrington College of California's tuition revenue.  DeVry May 2012 Quarterly Report, p. 37.

32.     American University of the Caribbean School of Medicine ("AUC") was acquired by DeVry Inc. in August 2011.  DeVry 2011 10k Report, p. 12.  AUC is located in St. Maarten and currently has approximately 1,000 enrolled students.  *Id.*  Similar to Ross M.D., students at AUC complete their classroom curriculum at the AUC campus in St. Maarten, followed by the clinical portion at an affiliated hospital in the United States or England.  *Id.*  As of September 2011, tuition at AUC begins at $16,900 per semester for the basic sciences portion, and increases to $18,900 per semester for the clinical portion of the program.  *Id.* at 24.  According to AUC's website, students are eligible for participation in the William D. Ford Direct Loan Program, which is part of Title IV of the HEA.  In 2011, Title IV funding accounted for 81% of AUC's tuition revenue.  DeVry May 2012 Quarterly Report, p. 37.

### LEGAL BACKGROUND OF THE FEDERAL FALSE CLAIMS ACT

33.     Liability under the False Claims Act, 31 U.S.C. § 3729(a)(1), arises when any person

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for
>     payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

34.     As used in the FCA, "knowing" and "knowingly" means "that a person, with respect to information . . . has actual knowledge of the information; [] acts in deliberant ignorance of the truth or falsity of the information; or [] acts in reckless disregard of the truth or falsity of the information; and [] require no proof of specific intent to defraud."  § 3729(b)(1)

35.     The FCA defines "claim" as:

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the Government. . . (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

§ 3729(b)(2).

36.     The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  § 3279(b)(4).

**FACTUAL AND LEGAL BACKGROUND OF TITLE IV OF THE HIGHER**

## EDUCATION ACT OF 1965

37.    The United States Government, through Title IV of the Higher Education Act of 1965 ("HEA"), is authorized to assist eligible students in attaining the benefits of postsecondary education by providing financial aid and special programs to such students, and by providing assistance to institutions of higher education.  20 U.S.C. § 1070(a).

38.    Specifically, Title IV authorizes the various financial aid programs offered by the Federal Government, including, for example, Federal Pell Grants ("Pell Grant") 20 U.S.C. §§ 1070a *et seq.*, 34 CFR § 690, the Federal Family Education Loan Program ("FFELP") 20 U.S.C. §§ 1071 *et seq.*, 34 CFR § 682, the William D. Ford Federal Direct Loan Program ("Direct Loan"), 20 U.S.C. §§ 1087a *et seq.*, 34 CFR § 685, and the Federal Perkins Loan Program ("Perkins Loan"), 20 U.S.C. §§ 1087aa *et seq.*, 34 CFR § 674.

**A.  Eligibility Under Title IV of the Higher Education Act of 1965**

39.    An institution of higher education ("school") may offer Title IV funding to its students if it complies with specific requirements prescribed by the HEA.  One such requirement for eligibility is each school must enter into a Program Participation Agreement ("PPA") with the Department of Education.  20 U.S.C. § 1094(a), 34 CFR § 668.14.

40.    Each PPA requires that the school certify that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA program."

41.    In each PPA, participating schools agreed to "comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA. . . ."

42.    PPAs require, for example, that eligible schools use funds in accordance with the

provisions of each program, not charge any student processing fees, establish administrative procedures and records to ensure proper administration of funds, andcertify the existence of a drug abuse preventing program at the school, among other things.  20 U.S.C. § 1094(a), 34 CFR § 668.14.

43.     PPAs also expressly require that each school "will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance . . . ."  20 U.S.C. § 1094(a)(20). This provision is known as the "incentive based compensation ban."

44.     The incentive based compensation ban is also reiterated in the Code of Federal Regulations at 34 CFR § 668.14(b)(22).  This version also includes further specific requirements that schools must agree to in their PPAs.

45.     Effective July 1, 2003, the version stated in 34 CFR § 668.14(b)(22) was clarified to include certain exceptions for compensation schemes that did not violate the incentive based compensation ban, commonly referred to as the "12 safe harbors."  Relevant here is § 668.14(b)(22)(ii)(A), which allowed schools to pay employees a

> fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

46.     In response to concerns of abusive and aggressive recruiting practices and an increasing number of federal school loans in default, the Department of Education reexamined the safe harbor provisions, and thereafter concluded that they should be repealed.  Thus, effective July 1, 2011, the HEA's ban on incentive based compensation no longer allowed for the exceptions permissible under the 2003 safe harbors.

47.     The incentive based compensation ban is an integral part of the policies behind Title IV funding as it was designed to protect the integrity of Government resources and postsecondary education by removing any incentive for schools to recruit and enroll students who are unable to successfully complete the academic programs of the school and therefore be unable to repay federal loans.

48.     As each PPA requires participating schools to certify compliance with all statutory provisions applicable to Title IV funding, each school therefore agrees to not misrepresent to current or prospective students the true nature of its educational programs, financial charges or employability of its graduates. *See* 34 CFR §§ 668.71 *et seq*. The code defines "misrepresentation" as "[a]ny false, erroneous or misleading statement an eligible institution makes to a student enrolled at the institution, to any prospective student, to the family of an enrolled or prospective student, or to the Secretary." *Id.*

49.     The Code also requires that each school must publish and make available to current and prospective students information about the school's financial assistance programs, the total cost of attending the institution, and the academic programs available at the institution. *See* 34 CFR §§ 668.42 - 668.43.

50.     In addition, participating schools must also submit an annual compliance audit of its administration of Title IV funding and a financial audit of the financial condition of the school in its entirety, both prepared by independent auditors. 20 U.S.C. § 1904(c)(1)(A); 34 CFR §§ 668.23(a)(2), (4).

51.     As part of these annual audits, each school must again certify that it complies with the requirements for eligibility to participate in Title IV funding, including the ban on incentive based compensation and misrepresentation.

**B.  Claims for Payment Under Title IV Programs**

52.     Once a school obtains eligibility to participate in Title IV funding, it claims payment of those funds through the student's application for Federal financial aid.  Interested students must complete and timely submit a "Free Application for Federal Student Aid," commonly known as a FAFSA, in order to be considered for Title IV funding.

53.     For Pell Grants, a student applies individually to the Department of Education or has the school submit an application to the Department on the student's behalf.  The Department of Education then calculates the student's Expected Family Contribution ("EFC") to determine the amount of grant money to disburse to the student.  The school then uses the EFC and other information to assemble a financial aid award package for the student.   The package may include Pell Grants, Direct Loans, Federal Work Study, Perkins Loans, or other types of aid for which the student may receive.  The student has the option to accept all, or part, of the award package.  If a Pell Grant or Direct Loan is accepted, the proceeds are disbursed by the Department of Education directly to the school.  Upon receipt, the school is then responsible for administering the grant proceeds by crediting the account of the recipient student.

54.     Loans under the FFELP (Stafford Loans, Federal PLUS Loans, Perkins Loans and Federal Consolidation Loans) are requested jointly by the student and school to private lenders that, upon approval, are guaranteed by state or private guaranty agencies and insured by the Department of Education.

55.     In order to receive loan proceeds under Title IV, a student must complete a Master Promissory Note ("MPN").  The school then completes a "School Certification" that is signed by a school representative certifying the accuracy of the information provided to the Department of Education and the student's eligibility for the loan.  Once approved by the lender, the funds are directly transferred to the school, where the school then credits the student's account for the amount borrowed.

56.     Because FFELP loans are guaranteed by state or private agencies and insured by the Department of Education, if a student defaults on a loan, the agency reimburses the lender for the outstanding balance and then takes assignment of the loan for collection.  If the agency is not able to collect, the Department of Education then reimburses the agency and, at its option, takes assignment of the loan.

## FACTUAL ALLEGATIONS REGARDING DEFENDANTS' PARTICIPATION IN FEDERAL AND STATE FINANCIAL AID FUNDING

### A. Defendants' Participation in Title IV Funding Programs

57.     DeVry Inc., through its subsidiary institutions, knowingly made false claims and certifications regarding compliance with the provisions and statutes required in order to receive Title IV funding, including the ban on incentive based compensation and misrepresentation to prospective students.  By falsely certifying compliance, DeVry institutions were able to obtain and maintain eligibility for Title IV funding, and therefore cause the Department of Education to pay numerous claims under Title IV.

#### a. In Order to Receive Title IV Funding, Defendants Entered into Program Participation Agreements with the U.S. Department of Education

58.     As explained above, in order for a school to obtain and maintain eligibility to receive Title IV funding, it must enter into a PPA with the Department of Education.  Each PPA states that eligibility under Title IV is contingent upon compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 CFR § 668.

59.     In all relevant time periods, Defendants signed and entered into numerous PPAs with the Department of Education.

60.     In each PPA, Defendants have certified they "will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements,

and limitations entered into under the authority of statutes applicable to Title IV of the HEA. . ..”

61.     Specifically, for PPAs signed both prior to and after the July 1, 2011 regulation change, Defendants have certified compliance with the HEA's ban on incentive based compensation. Defendants have also certified that they would not misrepresent the true nature of their educational programs, financial charges or the employability of their graduates.

62.     In addition to certifications made in PPAs, Defendants have made additional certifications of compliance with HEA rules and regulations as part of annual compliance audits and through the submission of documents in the student financial aid process.

63.     Ultimately, each Defendant school has knowingly certified compliance with HEA rules and regulations in order to obtain Title IV funding.

**b.   Defendants Have Received Title IV Funding Since at Least 2003**

64.     DeVry Inc. has received hundreds of millions and, more recently, billions, of dollars in tuition revenue each year.  The table below summarizes DeVry Inc.'s tuition revenue from 1994-2011.[2]

| FISCAL YEAR | DeVry Inc. Total Tuition Revenue  (approx.) |
|---|---|
| 2011 | $2.04 billion |
| 2010 | $1.79 billion |
| 2009 | $1.35 billion |
| 2008 | $1.00 billion |
| 2007 | $862.6 million |
| 2006 | $781.8 million |
| 2005 | $737.1 million |
| 2004 | $737.5 million |
| 2003 | $628.3 million |
| 2002 | $600.4 million |

---

[2] DeVry Inc.'s revenue and Title IV data were collected from its Quarterly and Annual Reports filed regularly with the Securities and Exchange Commission.  These reports are available on DeVry Inc.'s website: http://investors.devryinc.com/Investor-Relations/SEC-Filings/default.aspx

| 2001 | $523.9 million |
| 2000 | $443.8 million |
| 1999 | $382.8 million |
| 1998 | $321.0 million |
| 1997 | $280.7 million |
| 1996 | $236.6 million |
| 1995 | $207.5 million |
| 1994 | $191.2 million |

65.     As far back as data is readily available, federal financial aid has made up a very large percentage of DeVry Inc.'s tuition revenue.  For example, in 2011, 73% of DeVry Inc.'s tuition revenue ($2.04 billion) came from Title IV programs.  The table below shows the percentage of tuition revenue from Title IV funding for each of DeVry's subsidiary institutions for the years 2009-2011.

| DeVry Inc. Institutions | 2011 | 2010 | 2009 |
| --- | --- | --- | --- |
| DeVry University – Undergraduate | 81% | 77% | 77% |
| DeVry University – Graduate | 81% | 70% | 76% |
| Ross University School of Medicine | 81% | 81% | 78% |
| Ross University School of Veterinary Medicine | 89% | 89% | 86% |
| Chamberlain College of Nursing | 71% | 70% | 69% |
| Carrington College | 82% | 86% | 85% |
| Carrington College of CA | 85% | 83% | 83% |
| American University of the Caribbean | 81% | n/a[3] | n/a |
| DeVry Inc. Total | 73% | 71% | 74% |

66.     In 2008, 71% of all tuition revenue collected by DeVry Inc. came from Title IV funding, including 75% for DeVry University undergraduate and graduate programs, 81% for Ross M.D. and D.V.M jointly,[4] 62% for Chamberlain, 79% for Carrington College, and 77% for Carrington College of California.

67.     In 2007, 65% of all tuition revenue collected by DeVry Inc. came from Title IV

---

[3] Data is not available because American University of the Caribbean was not yet acquired by DeVry Inc.

[4] In 2005-2008, DeVry reported Ross M.D. and D.V.M Title IV data jointly.

funding, including 70% for DeVry University undergraduate programs, 65% for DeVry University graduate programs, 80% for Ross M.D. and D.V.M jointly, and 70% for Chamberlain.[5]

68.     In 2006,[6] Title IV funding made up 70% of DeVry University undergraduate tuition revenue, 60% of DeVry University graduate programs, 63% of Ross M.D. and D.V.M jointly, and 35% of Chamberlain.

69.     In 2005, Title IV funding made up 70% of DeVry University undergraduate tuition revenue, 75% of DeVry University graduate programs, and 70% of Ross M.D. and D.V.M. jointly.[7]

70.     In 2004, Title IV funding made up 63% of Devry University undergraduate tuition revenue and 70% of DeVry University graduate programs tuition revenue.[8]

71.     In 2003, Title IV funding made up 64% of DeVry University undergraduate tuition revenue and 40% of Devry University graduate programs tuition revenue.

72.     Over the years, DeVry Inc. has induced the government to pay billions of dollars in Title IV funding by falsely certifying compliance with the express provisions contained in Defendants PPAs with the Department of Education.

**B.   Defendants Receipt of State Financial Aid Funding**

---

[5] Prior to 2008, data for Carrington is not available because it was not yet acquired by DeVry Inc.
[6] Prior to 2007, DeVry Inc. did not report a total percentage of all revenue from Title IV funding.
[7] Prior to 2006, data for Chamberlain College of Nursing is not available because it was not yet acquired by DeVry Inc.
[8] Prior to 2005, data for Ross University is not readily available. Ross University was acquired by DeVry Inc. in 2003.

73.     Since 2007,[9] Defendants have received millions of dollars in state financial aid funding all while falsely certifying compliance with program eligibility requirements.  The table below summarizes the percentages of tuition revenue that DeVry Inc. has collected from state grants.

| FISCAL YEAR | Percentage of Tuition Revenue Derived From State-Funded Grants | DeVry Inc. Total Tuition Revenue (approx.) |
|---|---|---|
| 2011 | 2% | $2.04 billion |
| 2010 | 2% | $1.79 billion |
| 2009 | 2% | $1.35 billion |
| 2008 | 3% | $1.00 billion |
| 2007 | 3% | $862.6 million |

74.     In addition, several states also offer state-funded or state-guaranteed student loans and loan forgiveness programs for which students attending DeVry institutions were eligible.

## FACTUAL ALLEGATIONS REGARDING DEFENDANTS VIOLATIONS AND SUBMISSIONS OF FALSE CLAIMS

### A. Defendants' Violations of the Incentive Based Compensation Ban

75.     Beginning in at least September 2008 and through the present, DeVry Inc. has knowingly violated the HEA's incentive based compensation ban by compensating its MLAs, regional managers, and other admissions and financial aid personnel based on the number of new students that enrolled in DeVry or one of its subsidiary schools.

#### a. Prior to July 1, 2011

76.     Prior to the July 1, 2011 regulation change, there were a number of exceptions to the HEA's incentive based compensation ban, commonly referred to as the 12 safe harbors.

_____

[9] Data regarding DeVry Inc.'s state grant revenue is not readily available prior to fiscal year 2007.

Defendants' compensation scheme prior to July 1, 2011 did not fall under any of these exceptions and therefore violated the incentive based compensation ban. Despite knowingly violating the incentive based compensation ban, DeVry Inc. fraudulently certified compliance with these regulations in their PPAs with the Department of Education and in compliance audits.

77.    Defendants compensated their recruiting and financial aid personnel, including managers and directors, using a variable incentive plan. Under this scheme, employees received a base salary coupled with a variable element that was based solely on the employee's success in meeting enrollment and recruitment quotas.

78.    MLAs, for example, were given weekly quotas for the number of inquiries (or "leads"), applications, new enrollments and corporate agreements. If these quotas were met, the MLA would receive the full amount of his or her variable compensation. If MLAs failed to meet their quotas they were subject to numerous adverse actions, including decreased pay, demotions, warnings, probationary performance improvement plans, and termination. The activities subject to these weekly quotas all had to do with the recruitment and enrollment of new students, and were the only criteria used to determine an employee's variable compensation. Prior to July 2011, MLAs were required to generate 20-25 leads a week. The quotas were broken down by event and MLAs were expected to have at least 13% of individuals at each event apply to DeVry, with 7-8% starting at DeVry.

79.    Relator observed that her pay was directly related to her conversion[10] rates when she was an MLA. In the first year she had high conversions relative to other employees and met her quotas. She saw her pay increase from $60,000 to $73,000 within the first six months she

---

[10] "Conversion" is the term used by Devry to refer to new student enrollments. After the shift to the new regulatory world, Defendants began using "student outcomes" when referring to "conversions" in an attempt to further disguise their continued illegal compensation scheme.

was hired, and had a 20% total pay increase in her first year for meeting her quotas. Other DeVry MLAs with high conversion rates had similar large increases in their pay.

80.     The pay of Admissions Advisors was also determined based on enrollment numbers. There was a lot of pressure within the company for Admissions Advisors to get the highest number of students enrolled at DeVry. For instance, in the offices where Admissions Advisors made their calls to students there were whiteboards that listed the number of students enrolled by each employee. The competition to achieve the highest numbers was intense. The highest performing Admissions Advisors were very well compensated for their achievements in enrolling students, with some employees making over $100,000, and even $150,000.

81.     High performing employees were further compensated with trips. Every year, DeVry Inc. rewards its top performing employees from each department through its PRIDE program. PRIDE consists of an all-expenses-paid trip for the employee and a guest to attend the yearly PRIDE celebration, including airfare, hotel, meals and activities. Recruitment employees qualified for PRIDE based solely on their ability to meet their enrollment and recruitment quotas over the year.

82.     The sales culture at DeVry was constantly reinforced, even from the initial interview of an employee. Relator was responsible for interviewing MLAs, and was told by DeVry to make it clear to applicants that it was a sales job and to find those who could handle a high pressure environment. Employees who get students to enroll in DeVry would see their pay significantly increase within 6 months. Recruiters started out with extensive sales training. MLAs had "6 to Success," while Admission Advisors had "8 to Great," which were 6 weeks and 8 weeks long, respectively. After a new employee was hired, Relator was frequently asked about that employee's conversion numbers and whether they were "cutting it." Brett Shively, Vice President of DeVry, would ask "how many asses in the classes?" In other words, how

many new students is each new hire bringing to DeVry.

83.     Defendants knew that their compensation scheme violated the incentive based compensation ban based on the emphasis Defendants placed on meeting and exceeding enrollment quotas.  All upper-management and recruiters knew that their compensation was directly linked to their success in signing up new students because that information was closely tracked and published within the company as a way to motivate and further emphasize their importance.  What is more, the twice yearly performance evaluations for recruiters focused entirely on their enrollment quotas.  Because the pressure to meet enrollment quotas was so high, recruiters very often employed aggressive and unethical strategies to seek and sign-up new students.  For example, new students were signed up regardless of their qualifications or their ability to pay off school loans and information about the school or a student's financial obligations were often misrepresented.  All that really was required of DeVry students to enroll was a high school diploma.  However, DeVry would often interview students and create the appearance that they were going through a selective process.  In reality, DeVry's entire business model was built around incentivizing recruiters to enroll as many students as possible because DeVry knew that the government would ultimately pay the price for students who were ill-prepared for careers by DeVry and defaulted on their student loans.

**b.  <u>After July 1, 2011</u>**

84.     Starting in 2010, DeVry Inc. began to implement a new compensation scheme that sought to remove the variable component from the compensation of its recruitment personnel.  This new scheme was implemented in response to the regulation change which was to officially take effect on July 1, 2011.  Within DeVry Inc., this regulation change was referred to as the "New Regulatory World."  By July 1, 2011, all Defendants' campuses had shifted to this new compensation scheme for its recruiting and financial aid employees.

85.     During the summer of 2011, at a national meeting in Chicago, IL, the shift to the "new regulatory world" was formally announced by DeVry University President David Pauldine. Mr. Pauldine announced that covered employees under Title IV, including Ms. Feria, were no longer to be measured by their ability to meet recruitment and enrollment quotas.  In spite of this formal announcement by DeVry University's President, employee performance is still evaluated on reaching enrollment and recruitment quotas.  At the June 2011 Chicago meeting regional directors scheduled meetings to be held at a later date with all regional managers.  At these private meetings with regional managers, all regional directors were given documents with quotas for MLAs.  These documents were handed out in person to each regional manager.  By handing out quotas in person to regional managers rather than through email or other electronic means, DeVry hoped to avoid leaving a trail of evidence.  Further, these documents contained language that stated that the quotas were not to be considered in determining compensation, but were there to "help" potential students.  In fact, the quotas were just a continuation of DeVry's policy of illegally compensating admissions personnel based on enrollment.

86.     Under the new compensation system, employee performance is evaluated 40% on TEACH values and 60% on TKO numbers.  In reality, though, this new system functions just like the old system.  Compensation, promotions and even continued employment are still conditioned on an employee's ability to meet recruitment and enrollment quotas.  Upper-management attempts to cloak these old metrics under the auspices of the new, regulation-compliant system.  There is simply a major difference in DeVry's new compensation scheme as-written versus how it is actually implemented.

87.     The TEACH values, which make up 40% of an employee's performance, are part of DeVry Inc.'s overall mission statement.  They represent Teamwork and communication, Employee focus, Accountability, Continuous improvement, and Help[ing] students achieve their

goals.  Evaluations of an employee's TEACH values, however, are clearly a sham and a cover-up used by upper-management to incentivize employee performance using the old system. Specifically, an employee's TEACH evaluation is artificially lowered (or raised) based solely on enrollment and recruitment numbers.  There are no rubrics or scoring sheets used to measure an employee's TEACH values; they are measured unilaterally and with no consideration of what the values actually stand for.

88.     Similarly, the TKO (Time, Knowledge and Observations) numbers, which make up 60% of an employee's performance, is also a cover-up because employee performance is never actually judged by these numbers.   The Time component requires MLAs to meet quotas for the amount of events they put on or attended per week.  "Events" refers to marketing meetings or presentations for the purpose of generating "leads" for new enrollments.  The Knowledge component tracks an employee's knowledge of DeVry's programs and the completion of training programs.  And the Observation component refers to a manager's observations of its team members' events and progress.  The TKO metrics, however, are simply a pretext for compliance with the "new regulatory world."  In reality, upper-management does not care about TKO numbers, but only care about actual enrollment and recruitment numbers. This fact is common knowledge among MLAs and recruitment personnel, as well.  Employees whom Relator supervises have asked her if they were still being evaluated based on conversions, to which Relator had to answer affirmatively.  In some cases, they have directly said to Relator that they know they are being evaluated based on conversions.  In fact, one employee Relator supervised, Tariq Hill, specifically asked her to just tell him what his quota was.

89.     Even though Defendants state they no longer measure employee performance on enrollment numbers, Relator is required to discipline her team if they fail to meet satisfactory enrollment and recruitment numbers.  For example, one of Relator's MLAs, Christina Psalms,

was operating at 100% of her TKO quotas, but Ms. Feria's supervisor, Regional Director

Cynthia Escartin, was unhappy with Ms. Psalms' performance because her conversions were

insufficient. Ms. Escartin instructed Relator to have Ms. Psalms "shadow" another MLA from a

different region in order to learn how to increase conversions. Relator was told that if Ms.

Psalms did not turn her numbers around Ms. Psalms would be written up for poor performance.

90.    Because Defendants were prohibited by law from evaluating employees based on

enrollment numbers, a "write-up" for poor enrollment numbers would vaguely cite a failure to

satisfy the TEACH requirements described above. Despite what it might have said in an

employee's "write-up" letter, it was made clear verbally that the citation was really for poor

enrollment numbers. After a "write-up" letter was issued to an employee, the next step could be

anything from a pay decrease, demotion or termination.

91.    Since the change to the "new regulatory world," Defendants have continued to

track individual recruiter conversion rates. This information is communicated among upper-

management in conference calls and 1-on-1 meetings. Connie Hillgard, Manager of Budgets &

Analytics, also sends "warehouse" reports about conversion statistics for all admissions

personnel in all DeVry regions via email. These emails are sent to all regional managers,

regional directors, and campus deans. Furthermore, in approximately February or March 2012, a

new document was created on DeVry's computer network which closely and openly tracks the

conversion rates of all MLAs and recruitment employees. This document is accessible by MLAs

in an application called salesforce. In August of 2012 DeVry began instituting a new policy

where MLAs are told that they will be compensated up to $5,000 a year based on meeting their

quotas for enrolling new students.

92.    After the shift to the "new regulatory world," Defendants continued to

compensate their upper-management, including Ms. Feria, using the variable incentive plan. Ms.

Feria, through the recruiting efforts of her team, was required to meet certain quotas for enrollments and recruiting activities. If her quotas were met, Ms. Feria was eligible for increased compensation; however, if she failed to meet her quotas, her compensation would be decreased.

93.     In the new regulatory world, MLAs also continue to be compensated based on conversions. In the fall of 2011, Rosa Zubbrigen and Nancy Wetmore, both MLAs in the South Central Region (which includes Texas), led DeVry in conversions and were given large raises to compensate them for their high numbers. Employees supervised by Relator received raises in September of 2011, even though the team as a whole had low TKO numbers. The employees who received the largest raises had the highest conversion numbers. In September of 2011 TKOs for Relator's employees averaged only 65%. She brought them up to 100% by November; however, instead of receiving praise, her employees received poor reviews. It became apparent to her that upper management at DeVry was discontented with her team's conversion rates, and that employees would not receive favorable reviews without having high conversion rates—no matter if they complied perfectly with DeVry's new stated criteria. MLAs in Relator's region failed to receive raises, and in some case received paycuts, after September 2011 due to DeVry's dissatisfaction with their conversion rates.

94.     In addition to using salary adjustments to motivate employees, regional managers are told "be creative" with rewards for those with high conversion numbers, such as using paid time off as an incentive. Admissions Advisors are given awards for meeting their quotas, such as bowling parties. It is also common for MLAs to reward Admissions Advisors for helping MLAs meet enrollment quotas by taking Admissions Advisors out to lunch. However, starting in 2011, Relator's supervisor told her to be less open about putting reward lunches on expense accounts. Instead, she was told to hide lunches by paying out of her own pocket and then increasing expenses in other areas, such as mileage.

95.     DeVry continues also to push its focus on high pressure sales.  In August 2011 DeVry held a sales training meeting in which the firm Akina was one of the featured speakers. Employees were told to work on their "30 second commercial" or elevator pitch to recruit potential students.

96.     Potential students are called over and over again by Admissions Advisors, until they are told not to call.  Relator would also frequently receive calls from potential students who would tell her that they were still called by DeVry even after being asked to be added to the do-not-call list.

97.     Since the shift to the new regulatory world, Defendants have known that their new compensation policies violate the incentive based compensation ban.  Defendants continue to track and evaluate employees based on their success in securing new enrollments.  Documents and discussions that have to do with enrollment quotas are more secretive; however, management continues to put the same amount of emphasis and pressure on signing up new students.  Ultimately, despite attempting to put up a façade of regulatory compliance, Defendants continue to knowingly violate their PPAs by evaluating employee performance on enrollment and recruitment numbers and therefore, violating the HEA's incentive based compensation ban.

**B.   Defendants' Misrepresentations to Current and Prospective Students**

98.     Since at least September 2008, DeVry has made misrepresentations to students about statistics regarding employability after graduation, DeVry's accreditation, the cost of enrollment, and the transferability of credits.  Federal and state program participation agreements signed by DeVry prohibit Defendant from making misrepresentations to potential students.

99.     MLAs frequently misrepresented DeVry's accreditation.  DeVry is a nationally accredited school by the Higher Learning Commission.  Public universities and some private colleges are regionally accredited.  Regional accreditation is more universally accepted by other

schools and by employers.  Because DeVry is not regionally accredited, credits will not generally transfer to other schools like state colleges and universities.  Students who attempt to transfer to other schools from DeVry will frequently have no credits transfer and will therefore have to start all over with their degree.  However, when asked about DeVry's accreditation, MLAs were trained to say that it is accredited like any other school, such as public colleges like the California State school system.  Since there is a critical difference between regional and national accreditation, it is misleading for DeVry employees to make these statements to potential students.

100.    It was also not uncommon for MLAs to say that credits from other schools would be accepted by DeVry, when in reality, MLAs had no knowledge of whether credits would actually transfer.  In order to obtain this information, potential students would need to ask specific departments.  Relator heard students later tell her that their credits had not transferred to DeVry, even though a recruiter told them they would.

101.    Relator observed MLAs say that potential students were "guaranteed" a job six months after graduation.  Some recruiters would also speak about "job placement."  Any statements that recruiters have made that guaranteed a job after graduation were false.  In fact, Relator was aware of many students who struggled to find employment after graduating from DeVry.

102.    MLAs also made misrepresentations about the cost of DeVry programs.  The cost of education was a frequent question from potential students.  Often times, MLAs would not answer questions about the cost of education at DeVry.  Instead, they might say that "financial aid is available" when asked about the cost of DeVry.  This is misleading in that it does not reveal that loans have to be repaid or reveal what is the actual cost of attendance.  In fact, Relator was aware of students at DeVry who had $80,000 in loans for an undergraduate degree, which is

a very high figure compared to other options, such as public universities.  Further, the cost of attendance was especially important information for DeVry students to have because unlike other debts such as credit card debt, many educational loans are not dischargeable in bankruptcy. Upper-management discouraged MLAs from disclosing the cost of attendance at DeVry.  Some MLAs had some uncertainty about the cost of DeVry, but many MLAs sought to gloss over the cost of DeVry because they knew it would harm their enrollment numbers as potential students would be deterred at the high cost of education at DeVry

103.    After the new regulatory world, DeVry attempted to create the appearance that they were serious about correcting misrepresentations made by recruiters.  They created "cheat sheets" about what employees could and could not say about statistics regarding employability after graduation, DeVry's accreditation, the cost of enrollment, and the transferability of credits. They also hired a company to institute a "mystery shopper" program to do quality control.[11] However, at least in California, the mystery shopper company used the same person each time and a standard script.  It was obvious to Relator and most of the employees she supervised when a mystery shopper was calling because they would recognize the caller's voice and the script of questions.  The mystery shopper program, therefore, was ineffective.

104.    Even into 2011, Relator heard MLAs make misrepresentations to students. Relator reported some of the misrepresentations she heard to DeVry, but she never heard anything from DeVry about her reports.  In one specific example, Jacqueline Cermak made misrepresentations about DeVry's accreditation while a mystery shopper and Relator were monitoring her, but Ms. Cermak was never disciplined for this misrepresentation.  In fact,

---

[11] A mystery shopper poses as a customer and asks questions to employees to see if they are complying with company policies.

Relator never heard of anyone at DeVry being disciplined for making misrepresentations. DeVry continued to pressure recruiters to enroll as many students as possible, so despite the cheat cheats and mystery shopper program, recruiters continued to make misrepresentations to students.

105.    By making misrepresentations to potential students, Defendants have violated the federal and state program participation agreements that they entered into in order to receive government funding.

### C. Defendants' Submission of False Claims

106.    Because Defendants have violated the terms of eligibility to receive Title IV funding, they have therefore submitted false claims for payment each time they requested Title IV funding from the government on a student's behalf.  In other words, every time a request was made for a federal grant, a federally-provided or federally-guaranteed loan, or federal work study on a student's behalf, Defendants have submitted a false claim for payment from the Government.  Indeed, the same is true for all Government-paid interest payments on loans and each time the Government was forced to assume ownership of a federally-guaranteed loan that went into default.

107.    These requests for payment were fulfilled by the Government to the Defendant institutions as evidenced by DeVry Inc.'s annual reports which indicated the percentage of funds received each year from Title IV sources.  For example, in 2011, a year that DeVry Inc. made over $2 billion in total tuition revenue, 73% of that total came from Title IV funding and 2% came from state-funded grants.

### COUNT ONE:
**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE OR FRAUDULENT CLAIMS SUBMITTED DUE TO FALSE CERTIFICATION OF COMPLIANCE WITH TITLE IV OF THE HEA (31 U.S.C. §3729(a)(1)(A))**

108.     Relator re-alleges and incorporates by reference the allegations in paragraphs 1-107 above.

109.     Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States, in violation of 31 U.S. C. §3729(a)(1)(A).

110.     As a result of these false claims, the United States has been damaged and continues to be damaged in an amount yet to be determined.

**COUNT TWO:**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE RECORDS &**
**STATEMENTS REGARDING COMPLIANCE WITH TITLE IV OF THE HEA (31**
**U.S.C. §3729(a)(1)(B))**

111.     Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.

112.     Through the acts described above, Defendants knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims for payment or approval by the United States, in violation of 31 U.S. C. §3729(a)(1)(B).

113.     As a result of these false claims, the United States has been damaged and continues to be damaged in an amount yet to be determined.

**PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

114.     WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants for Counts I-II, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)      That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

(c)      That pre- and post-judgment interest be awarded, along with reasonable Attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)      That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(e)      That this Court award such other and further relief as it deems proper.

## COUNT THREE:
## VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT

115.      Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Defendants.  Defendants conduct business in the State of California.  Upon information and belief, Defendants' actions described herein occurred in California as well.

116.      This is a qui tam action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*

117.      The California False Claims Act ("CFCA") provides that a person is liable to the State of California when that person:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or cause to be made or used a false record or statement material to a false or fraudulent claim.

Cal. Gov't Code § 12651(a)(1)-(2).

118.    "Claim," under the CFCA, refers to:

any request or demand, whether under a contract or otherwise, for money,

property, or services, and whether or not the state . . . has title to the money,

property, or services that meets either of the following conditions:

(A) Is presented to an officer, employee, or agent of the state . . . .

Cal. Gov't Code § 12650(b)(1).

119.    The CFCA defines the term "knowingly" as a person who "(A) Has actual

knowledge of the information[,] (B) Acts in deliberate ignorance of the truth or falsity of the

information[, or] (C) Acts in reckless disregard of the truth or falsity of the information."

Furthermore, "proof of specific intent to defraud is not required."  Cal. Gov't Code §

12650(b)(3).

120.    Pursuant to Title 5, Division 4 of the California Code of Regulations and

California Education Code §§ 69430-69551, the State of California is authorized to provide

financial assistance to California postsecondary students.  Cal-Grants, for example, are

administered by the California Student Aid Commission ("CSAC") and are distributed directly to

the institution on the student's behalf.

121.    Similar to that of Title IV funding, schools seeking to participate in the Cal-Grant

program must enter into an Institutional Participation Agreement ("IPA") with the CSAC.  In

each IPA, schools expressly certify that they understand the qualifying requirements set forth in

Cal. Educ. Code § 69432.7(l)(1), and that they will lose eligibility if they fail to satisfy these

requirements. A private or independent postsecondary institution qualifies for the Cal-Grant

program if that institution "participates in the [Federal] Pell Grant Program and in at least two of

the following federal campus-based student aid programs: (i) Federal Work-Study, (ii) Perkins Loans Program, (iii) Supplemental Educational Opportunity Grant Program." Cal. Educ. Code § 69432.7(l)(1)(A).  In other words, to be eligible for the Cal-Grant program, an institution must be in compliance with the eligibility requirements for Title IV funding.  The IPA also requires that the participating school comply with "all current and applicable federal and state law and regulations in its implementation of the terms of this Agreement."

     122.    Through the conduct described in this complaint, Defendants knowingly presented and caused to be presented to the State of California false and fraudulent claims for payment and approval.  Defendants also knowingly made, used, and caused to be made and used, false records and statements that were material to false or fraudulent claims made to the State.

     123.    The State of California, unaware of the fraudulent foundation of Defendants' claims, paid money in the form of Cal-Grants to Defendants that otherwise would not have been paid.  As a result of these payments, the State of California has suffered, and continues to suffer, damages in an amount to be determined.

     124.    Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of herself and the State of California.

     125.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of California in the operation of its financial aid programs.

### PRAYER FOR RELIEF UNDER THE CALIFORNIA FALSE CLAIMS ACT

     126.    WHERFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF CALIFORNIA:

- Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal conduct;

- A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the State of California;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- Litigation costs and reasonable attorney's fees;

- Such further relief as this Court deems equitable and just.

## <u>COUNT FOUR:</u>
## VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT

127.    Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Defendants.  Defendants conduct business in the State of Delaware.  Upon information and belief, Defendants' actions described herein occurred in Delaware as well.

128.    This is a qui tam action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, Del. Code tit. 6, §§ 1201, *et seq.*

129.    The Delaware False Claims and Reporting Act ("DFCRA") provides that a person is liable to the State of Delaware for treble damages and civil penalties if that person:

(1) Knowingly presents, or causes to be presented to an officer or employee of the

Government a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses or causes to be made or used a false record or

statement to get a false or fraudulent claim paid or approved by the Government.

Del. Code tit. 6, § 1201(a).

130.    The Act defines "claim" as

any request or demand, whether under a contract or otherwise, for money or

property which is made to a contractor, grantee or other recipient where the

Government provides any portion of the money or property which is requested or

demanded, or where the Government will reimburse such contractor, grantee or

other recipient for any portion of the money or property which is requested or

demanded.

Del. Code tit. 6, § 1202(1).

131.    "Knowingly," under the DFCRA, has been defined as a person, with

respect to information,

a. Has actual knowledge of the information;


b. Acts in deliberate ignorance of the truth or falsity of the information; or


c. Acts in reckless disregard of the truth or falsity of the information, and no proof

of specific intent to defraud is required.

Del. Code tit. 6, § 1202(3).

132.    Pursuant to Title 14, Part I, Chapter 1, Subchapter V of the Delaware

Code, the State of Delaware is authorized to "[e]nsure that higher education is accessible

and affordable to all Delaware students who qualify for admission by providing financial assistance. . . ." These programs are administered by the Delaware Higher Education Office.

133.    On information and belief, Delaware requires that financial aid be used at any eligible school that participates in Title IV federal aid programs.  As such, any school that receives Delaware funded student aid must be in compliance with the rules and regulations of Title IV of the HEA, including the bans on incentive based compensation and misrepresentation.

134.    Through the conduct described in this Complaint, Defendants knowingly caused to be presented to the State of Delaware false and fraudulent claims for payment or approval. Defendants also knowingly made, used, and caused to be made and used false records and statements in order to get false and fraudulent claims paid and approved by the State.

135.    The State of Delaware, unaware of the fraudulent foundation of Defendants' claims, paid money in the form of grants and scholarships to Defendants that otherwise would not have been paid.  As a result of these payments, the State of Delaware has suffered, and continues to suffer, damages in an amount to be determined.

136.    Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to Del. Code tit. 6, § 1203(b) on behalf of herself and the State of Delaware.

137.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its financial aid programs.

### PRAYER FOR RELIEF UNDER THE DELAWARE FALSE CLAIMS ACT

138.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:
- Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' fraudulent and illegal conduct;

- A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant presented or caused to be presented to the State of California;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:
- The maximum amount allowed pursuant to Del. Code tit. 6, § 1205 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- Litigation costs and reasonable attorney's fees;

- Such further relief as this Court deems equitable and just.

## COUNT FIVE:
## VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

139.    Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of DeVry.  DeVry conducts business in the District of Columbia.  Upon information and belief, Defendants' actions described herein occurred in the District of Columbia as well.

140.    This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code §§ 2-381.01 *et seq*.

141.    D.C. Code § 2-381.02(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

(2) Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

\* \* \*

(8) Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

142.     Defendants violated D.C. Code §§ 2-381.02(a) by continuously engaging in the fraudulent and illegal conduct described herein.

143.     The District of Columbia is authorized to provide financial assistance to DeVry students who are seeking a postsecondary education.

144.     On information and belief, the District of Columbia requires that financial aid be used at any eligible school that participates in Title IV federal aid programs.  As such, any school that receives the District of Columbia funded student aid must be in compliance with the rules and regulations of Title IV of the HEA, including the bans on incentive based compensation and misrepresentation.

145.     Had the District of Columbia known that Defendants were violating the federal and state laws cited herein, the District of Columbia would not have paid such claims.

146.     As a result of Defendant's violations of D.C. Code § 2-381.02(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

147.     Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to D.C. Code § 2-381.03(b) on behalf of herself and the District of Columbia.

148.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia.

149.    WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Defendants:

To the DISTRICT OF COLUMBIA:

Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' fraudulent and illegal conduct;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to D. C. Code § 2-381.03(f) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT SIX:
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

150.    Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Defendants.  Defendants conduct business in the State of Florida.  Upon information and belief, Defendants' actions described herein occurred in Florida as well.

151.    This is a qui tam action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq.*

152.    The Florida False Claims Act ("FFCA") provides that a person is liable to the State of Florida for treble damages and civil penalties if that person:

> (a) Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

Fla. Stat. Ann. § 68.082(2)(a),(b).

153.    The FFCA defines "agency" as "any official, officer, commission, board, authority, council, committee, or department of the executive branch of state government." Fla. Stat. Ann. § 68.082(1)(a).

154.    The FFCA defines "claim" as "any written or electronically submitted request or demand, under a contract or otherwise, for money, property, or services, which is made to any employee, officer, or agent of an agency. . . ." Fla. Stat. Ann. § 68.082(1)(b).

155.    "Knowingly," under the FFCA, has been defined as a person, with respect to information,

1. Has actual knowledge of the information;

2. Acts in deliberate ignorance of the truth or falsity of the information; or

3. Acts in reckless disregard of the truth or falsity of the information.

No proof of specific intent to defraud is required.

Fla. Stat. Ann. § 68.082(1)(c).

156.    Pursuant to Florida Statute §§ 1009.01 *et seq.,* the State of Florida is authorized to provide financial assistance in the form of grants and scholarships to Florida students seeking a postsecondary education.  These programs are administered by the Florida Board of Education.

157.    In order to participate in Florida grant and scholarship programs, participating institutions must also be eligible for Title IV funding and therefore in compliance with all Title IV regulations, including the bans on incentive based compensation and misrepresentation.

158.    Through the conduct described in this Complaint, Defendants knowingly caused to be presented to the State of Florida false and fraudulent claims for payment or approval. Defendants also knowingly made, used, and caused to be made and used false records and statements in order to get false and fraudulent claims paid and approved by the State.

159.    The State of Florida, unaware of the fraudulent foundation of Defendants' claims, paid money in the form of grants and scholarships to Defendants that otherwise would not have been paid.  As a result of these payments, the State of Florida has suffered, and continues to suffer, damages in an amount to be determined.

160.    Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to Fla. Stat. Ann. § 68.083(2) on behalf of herself and the State of Florida.

161.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its financial aid programs.

### PRAYER FOR RELIEF UNDER THE FLORIDA FALSE CLAIMS ACT

162.    WHERFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF FLORIDA:
- Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' fraudulent and illegal conduct;

- A civil penalty of up to $11,000 for each false claim which Defendants presented or caused to be presented to the State of California;

- Prejudgment interest; and

- All costs incurred in bringing this action

To RELATOR:
- The maximum amount allowed pursuant to Fla. Stat. Ann. § 68.085 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- Litigation costs and reasonable attorney's fees;

- Such further relief as this Court deems equitable and just.

## COUNT SEVEN:
## VIOLATION OF THE HAWAII FALSE CLAIMS ACT

163.    Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of DeVry.   DeVry conducts business in the State of Hawaii.   Upon information and belief, Defendants' actions described herein occurred in Hawaii as well.

164.    This is a qui tam action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661.21 *et seq.*

165.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who:

Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

166.    Defendants violated Haw. Rev. Stat. § 661-21(a) by continuously engaging in the fraudulent and illegal conduct described herein.

167.    The State of Hawaii is authorized to provide financial assistance to DeVry students who are seeking a postsecondary education.

168.    On information and belief, Hawaii requires that financial aid be used at any eligible school that participates in Title IV federal aid programs. As such, any school that receives Hawaii funded student aid must be in compliance with the rules and regulations of Title IV of the HEA, including the bans on incentive based compensation and misrepresentation.

169.    Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein, the State of Hawaii would not have paid such claims.

170.    As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a), the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

171.    Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of herself and the State of Hawaii.

172.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii.

173.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF HAWAII:

Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' fraudulent and illegal conduct;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Hawaii;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## <u>COUNT EIGHT:</u>
## VIOLATION OF THE ILLINOIS FALSE CLAIMS ACT

174.    Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Defendants.   Defendants conduct business

in the State of Illinois.  Upon information and belief, Defendants' actions described herein occurred in Illinois as well.

175.    This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

176.    The Illinois False Claims Act ("IFCA") provides that a person is liable to the State of Illinois for treble damages and civil penalties if that person:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]

740 ILCS 175/3(a)(1)(A),(B).

177.    The IFCA defines "claim" as

any request or demand, whether under a contract or otherwise, for money or property and whether or not the State has title to the money or property, that

(i)  is presented to an officer, employee, or agent of the State[.]

740 ILCS 175/3(b)(2).

178.    The IFCA defines "knowingly" as a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and (B) require no proof of specific intent to defraud."

179.    Pursuant to the Higher Education Student Assistance Act, 110 ILCS 947/1 *et seq.*, the State of Illinois is authorized to provide financial assistance in the form of scholarships and grants to residents who are seeking a postsecondary education.  This program is administered by the Illinois Student Assistance Commission ("ISAC").  The ISAC's administrative rules set

forth, among other things, the requirements for an institution to be eligible for Illinois-funded scholarships and grants.  Relevant here is the requirement that all institutions must execute an ISAC Program Participation Agreement, which includes certifications of compliance with statutes, federal regulations and State rules.  Furthermore, ISAC requires that eligible schools also have a valid Program Participation Agreement with the U.S. Department of Education, as required by section 487 of the Higher Education Act.  As such, eligibility for Illinois-funded student aid programs requires the same eligibility as the programs offered under Title IV, including the bans on incentive based compensation and misrepresentation.

180.    Through the conduct described in this Complaint, Defendants knowingly presented and caused to be presented to the State of Illinois false and fraudulent claims for payment and approval.  Defendants also knowingly made, used, and caused to be made and used, false records and statements that were material to false or fraudulent claims made to the State.

181.    The State of Illinois, unaware of the fraudulent foundation of Defendants' claims, paid money in the form of grants and scholarships to Defendants that otherwise would not have been paid.  As a result of these payments, the State of Illinois has suffered, and continues to suffer, damages in an amount to be determined.

182.    Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to 740 ILCS 175/4(b) on behalf of herself and the State of Illinois.

183.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its financial aid programs.

**PRAYER FOR RELIEF UNDER THE ILLINOIS FALSE CLAIMS ACT**

184.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF ILLINOIS:
- Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' fraudulent and illegal conduct;

- A civil penalty of up to $11,000 for each false claim which Defendants presented or caused to be presented to the State of Illinois;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:
- The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- Litigation costs and reasonable attorney's fees;

- Such further relief as this Court deems equitable and just.

## COUNT NINE:

### VIOLATION OF THE INDIANA FALSE CLAIMS ACT

185.     Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of DeVry.  DeVry conducts business in the State of Indiana.  Upon information and belief, Defendants' actions described herein occurred in Indiana as well.

186.     This is a qui tam action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

187.    IC 5-11-5.5-2(b) provides liability for any person who:

(1) Presents a false claim to the state for payment or approval;

(2) Makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

* * *

(6) Makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) Conspires with another person to perform an act described in subdivisions (1) through (6);

(8) Causes or induces another person to perform an act described in subdivisions (1) through (6).

188.    Defendant violated IC 5-11-5.5-2 by continuously engaging in the fraudulent and illegal conduct described herein.

189.    Pursuant to state law, the State of Indiana is authorized to provide financial assistance to Indiana students who are seeking a postsecondary education.

190.    On information and belief, Indiana requires that financial aid be used at any eligible school that participates in Title IV federal aid programs.  As such, any school that receives Indiana funded student aid must be in compliance with the rules and regulations of Title IV of the HEA, including the bans on incentive based compensation and misrepresentation.

191.    Had the State of Indiana known that Defendants were violating the federal and state laws cited herein, the State of Indiana would not have paid such claims.

192.    As a result of Defendants' violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

193.    Relator is a private person with direct and independent knowledge of the

allegation in this Complaint, who has brought this action pursuant to IC 5-11-5.5-4 on behalf of

herself and the State of Indiana.

194.    This court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts

separate damage to the State of Indiana.

195.    WHEREFORE, Relator respectfully requests this Court to award the following

damages to the following parties and against Defendants:

To the STATE OF INDIANA:
>   Three times the amount of actual damages which the State of Indiana has
>   sustained as a result of Defendants' fraudulent and illegal conduct;
>
>   Prejudgment interest; and
>
>   All costs incurred in bringing this action.

To RELATOR:

>   The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other
>   applicable provision of law;
>
>   Reimbursement for reasonable expenses which Relator incurred in connection
>   with this action;
>
>   An award of reasonable attorneys' fees and costs; and
>
>   Such further relief as this Court deems equitable and just.

## COUNT TEN:
## VIOLATION OF THE IOWA FALSE CLAIMS ACT

196.    Relator re-alleges and incorporates the allegations in paragraphs 1-107 as if fully

set forth herein.  Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide, continuous practice of Defendants.   Defendants conduct business

in the State of Iowa.  Upon information and belief, Defendants' actions described herein occurred in Iowa as well.

197.    This is a qui tam action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code Ann. §§ 685.1 *et seq.*

198.    The Iowa False Claims Act provides that a person is liable to the State of Iowa for treble damages and civil penalties if that person:

a. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

b. knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

Iowa Code Ann. § 685.2.

199.    The Act defines "claim" as

any request or demand, whether pursuant to a contract or otherwise, for money or property and whether the state has title to the money or property, which is presented to an officer, employee, agent, or other representative of the state or to a contractor, grantee, or other person if the money or property is to be spent or used on the state's behalf or to advance a state program or interest, and if the state provides any portion of the money or property which is requested or demanded, or if the state will reimburse directly or indirectly such contractor, grantee, or other person for any portion of the money or property which is requested or demanded.

Iowa Code Ann. § 685.1.

200.    The Act defines "knowingly" as a person, with respect to information,

(1) Has actual knowledge of the information.

(2) Acts in deliberate ignorance of the truth or falsity of the information.

(3) Acts in reckless disregard of the truth or falsity of the information

. . . [and] does not require proof of specific intent to defraud.

201.    Pursuant to Title VII, Subtitle 3, Chapter 261, the State of Iowa is authorized to provide financial assistance in the form of scholarships and grants to residents who are seeking a postsecondary education.  These programs are administered by the College Student Aid Commission (CSAC).

202.    The CSAC's administrative rules set forth, among other things, the requirements for an institution to be eligible for Iowa-funded scholarships and grants.  For example, the Education and Training Voucher Grant requires participating schools to meet the definition of "institution of higher education" as defined in section 102 of the Higher Education Act.

203.    Through the conduct described in this Complaint, Defendants knowingly presented and caused to be presented to the State of Iowa false and fraudulent claims for payment and approval.  Defendants also knowingly made, used, and caused to be made and used, false records and statements that were material to false or fraudulent claims made to the State.

204.    The State of Iowa, unaware of the fraudulent foundation of Defendants' claims, paid money in the form of grants and scholarships to Defendants that otherwise would not have been paid.  As a result of these payments, the State of Iowa has suffered, and continues to suffer, damages in an amount to be determined.

205.    Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to Iowa Code Ann. § 685.3(2.) on behalf of herself and the State of Iowa.

206.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its financial aid programs.